# STATE OF CONNECTICUT *v.* GILBERTO GONZALEZ
## (SC 16977)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued March 11, 2004—officially released January 25, 2005

*James A. Killen,* senior assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich,* state's attorney, and *Debra Collins,* assistant state's attorney, for the appellant (state).

*Moira L. Buckley,* assistant public defender, for the appellee (defendant).

*Opinion*

PALMER, J. A jury found the defendant, Gilberto Gonzalez, guilty of two counts of sexual assault in the first degree in violation of General Statutes (Rev. to 1993) § 53a-70 (a) (2)[1] and two counts of risk of injury

---

[1] General Statutes (Rev. to 1993) § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with a person under thirteen years of age . . . ."

We note that the defendant's conviction of sexual assault in the first degree was based upon acts allegedly committed between January, 1993, and April, 1994. The legislature amended General Statutes (Rev. to 1993) § 53a-70 (a) (2), effective October 1, 1993, by imposing an additional element,

to a child in violation of General Statutes (Rev. to 1993) § 53-21.[2] After the trial court rendered judgment in accordance with the jury's verdict,[3] the defendant appealed to the Appellate Court, which concluded that the defendant was entitled to a new trial due to the improper admission of certain constancy of accusation evidence. See *State* v. *Gonzalez*, 75 Conn. App. 364, 368, 815 A.2d 1261 (2003). We granted the state's petition for certification limited to the following issue: "Did the improper admission of the challenged constancy of accusation testimony constitute harmful error?" *State* v. *Gonzalez*, 263 Conn. 913, 822 A.2d 242 (2003). We conclude that the evidentiary impropriety was harmless and, therefore, that, contrary to the determination of the Appellate Court, the improper admission of the constancy of accusation evidence does not warrant a new trial. In light of that conclusion, we also address the defendant's alternative grounds for affirming the judgment of the Appellate Court. Specifically, the defendant claims that: (1) his due process right to a fair trial was violated by virtue of the trial court's failure to maintain the appearance of impartiality; (2) the trial court improperly allowed one of the state's expert witnesses to testify in a manner that unfairly bolstered the victim's credibility; and (3) the trial court improperly permitted the victim's mother to testify regarding her belief that

namely, that the actor be more than two years older than the person against whom the sexual assault is perpetrated. We note that this element is not at issue in this appeal. Thus, in the interest of simplicity, we refer to General Statutes (Rev. to 1993) § 53a-70 (a) (2) as the statute under which the defendant was charged and convicted.

[2] General Statutes (Rev. to 1993) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

[3] The trial court imposed a total effective sentence of sixty years imprisonment, execution suspended after forty years, and ten years probation.

the defendant had sexually abused the victim. We reject the first and third of these claims and decline to review the second of these claims. Accordingly, we reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "The victim[4] was born in 1985. In 1993 and 1994, the victim lived with her mother, the victim's two half-sisters and the defendant. The defendant and the victim's mother had lived together [since] the victim was two years old.

"The victim testified that the defendant sexually assaulted her at least four times a week during 1993 and 1994. Those assaults occurred in the family home while the victim's mother was either absent from the apartment or while she was in another part of the apartment sleeping. The victim testified that she did not cry out or otherwise attempt to tell her mother about the assaults because the defendant had threatened her. One of the victim's half-sisters witnessed the assaults on the victim on several occasions. The defendant unsuccessfully attempted to coerce the half-sister into participating in those acts.

"The half-sister eventually disclosed the defendant's abuse of the victim to a friend at school. That friend, in turn, told [a] school social worker about the sexual assaults. On March 24, 1994, the [school] social worker spoke with the victim about the assaults. The victim testified that although her half-sister had encouraged her to confide in the school social worker, she initially had lied to the social worker and denied that the defendant had assaulted her. At trial, the victim stated that she had denied that those assaults had occurred because she was afraid of the defendant. The victim

---

[4] In accordance with General Statutes § 54-86e, and in order to protect the victim's legitimate privacy interests, we do not identify the victim or others through whom the victim's identity could be ascertained.

eventually did tell the school social worker that the defendant had assaulted her. The victim also was interviewed by [Rita Kornblum] an intake worker for the department of children and families (department) and [Kimberly Herwerth] a sexual assault crisis counselor. During those interviews, the victim confirmed the allegations of abuse.

"Following those interviews, the victim and her half-sister confronted the defendant and the victim's mother with the allegations of abuse during a meeting at the department's offices. After that meeting, the department took the children into its custody. Three days later, the defendant fled to Puerto Rico. On March 2, 2000, a fugitive task force arrested the defendant in Puerto Rico. [The defendant] was extradited to Connecticut on March 22, 2000.

"On April 5, 1994, a physician [Frederick Berrien] examined the victim on the department's referral. Although his examination did not establish conclusively that the victim had been sexually assaulted, the physical evidence was sufficient for [Berrien] . . . to form 'a very high degree of suspicion' that the victim had been exposed to some form of sexual contact." *State* v. *Gonzalez,* supra, 75 Conn. App. 366–68. At the conclusion of the defendant's trial, the jury found him guilty of two counts of sexual assault in the first degree and two counts of risk of injury to a child.

On appeal to the Appellate Court, that court agreed with the defendant that the trial court improperly had permitted two witnesses to testify regarding the details of complaints made by the victim in violation of *State* v. *Troupe,* 237 Conn. 284, 304, 677 A.2d 917 (1996).[5]

---

[5] In *Troupe,* we held that "a person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example,

Without explicitly engaging in a harmful error analysis, the Appellate Court reversed the judgment of conviction on the basis of this evidentiary impropriety and remanded the case for a new trial. See *State* v. *Gonzalez,* supra, 75 Conn. App. 368, 373, 386. On appeal to this court following our granting of certification, the state claims that, although the challenged constancy of accusation evidence exceeded the bounds of *Troupe,* its admission was harmless. The defendant contends that the Appellate Court properly concluded otherwise and contends, alternatively, that several other alleged evidentiary improprieties warrant affirmance of the judgment of the Appellate Court. We agree with the state that neither the improperly admitted constancy of accusation evidence nor the other alleged evidentiary improprieties require a new trial.

I

We first address the state's claim that the improperly admitted constancy of accusation evidence was harmless. The following facts and procedural history are relevant to this claim. Prior to trial, the defendant filed a motion in limine seeking to bar the state from introducing any constancy of accusation evidence. The defendant alternatively requested that any such evidence be limited in accordance with the dictates of *Troupe.* The trial court denied the defendant's motion to bar the state from introducing any constancy of accusation evidence with the caveat that, in accordance with the principles set forth in *Troupe,* such evidence would be limited to the fact that the victim made a complaint, the date and nature of that complaint, and the identity of the assailant.

the time and place of the attack or the identity of the alleged perpetrator." *State* v. *Troupe,* supra, 237 Conn. 304.

Subsection (c) of § 6-11 of the Connecticut Code of Evidence, which was applicable to the defendant's trial, "reflects [this court's holding] . . . in [*Troupe*] . . . ." Conn. Code Evid. § 6-11 (c), commentary.

At trial, the state called the victim as its first witness. The victim testified at length, and in graphic detail, regarding the defendant's repeated sexual assaults. In particular, she explained that the defendant "would place [his] penis in my vagina and he would put his penis in my anus and he would put his mouth in my vagina." The victim testified that, on one occasion, the defendant "came into my bedroom, tried to wake me up, pulled down my underwear and he would put his penis in my vagina and his mouth in my vagina," and that, another time, the defendant "[got] some Vaseline . . . and put it on my vagina and on my anus and then he put his penis in my vagina and in my anus and it hurt so much that—it just hurt and he wouldn't stop and [it] burned." The victim further stated that, on another occasion, the defendant "had [the] bathtub ready, filled with water, and he told me to take off my clothes and he took off my underwear and he was undressed and he told me to get into the bathtub and he had soap, a bar of soap, and he wet the soap and made bubbles and he put the soap in my vagina and when he was doing that it just burned . . . it burned like fire. And then, while I was in the bathtub and he went in the bathtub at the same time . . . he put his penis in my vagina." The victim explained that, on yet another occasion, the defendant "wrestled me . . . . [H]e grabbed me as if I was a baby, like he was . . . changing a baby's diaper," and that, on that occasion, "he put his penis in my vagina and in my anus."

The victim also testified about the lurid details of other incidents of sexual abuse by the defendant. In describing one such incident, the victim stated that the defendant "was on top of [the] bed . . . and . . . he told me to take off my clothes and my underwear. He had his pants down and his underwear down and put his penis in my vagina and while he was doing that— the time that he was doing that—all this white stuff

came out and that stuff just, just stink, and that made me throw up, and it just bothered me so much that, you know . . . he even put the white stuff in me while he was putting his penis in me." The victim described how she "would cry because of the pain," but the defendant would not stop the abuse. She also explained that, while the defendant was penetrating her vaginally and anally, he would ask "if I liked it or [if] someday I would let a guy do that to me." The victim further indicated that there were occasions when she knew that the defendant had ejaculated because, as she explained, she "would smell the white stuff."

One of the victim's half sisters, who witnessed some of the abuse perpetrated on the victim by the defendant, also testified for the state. Her testimony, like that of the victim, was detailed and graphic. She explained that she had seen the defendant put "his penis in [the victim's] vagina" and "his mouth in her vagina." She further indicated that she had seen "some white stuff coming out of [the defendant's penis]," and that the defendant had put the "white stuff" in the victim's vagina with his hand. The victim's half sister also testified that the defendant had asked her to participate.

Kornblum, the department intake worker who had interviewed the victim, also testified for the state. In response to questioning by the assistant state's attorney regarding Kornblum's interview with the victim, Kornblum stated: "[The victim] disclosed that [the defendant] had touched her private parts and that he had inserted his penis, which she called 'butt' at that time, into her private parts, which she meant her vagina, and that this had happened on several occasions, and one time she described . . . some white stuff coming out of his butt called 'penis.' " Defense counsel objected to Kornblum's testimony on the basis of the trial court's ruling on the defendant's motion in limine. The court excused the jury and, after entertaining arguments con-

cerning defense counsel's objection, took no specific action in regard to Kornblum's testimony. Thereafter, however, Kornblum did not revisit the details of the assault, and her testimony proceeded without further objection.

The state also called Herwerth, the sexual assault crisis counselor who had interviewed the victim, as a witness. On direct examination, Herwerth was asked what the victim had told her during the interview, and defense counsel objected on the basis of the court's prior ruling on the defendant's motion in limine. The court overruled the objection,[6] and Herwerth testified in relevant part: "[The victim] disclosed [to me] that, on several occasions . . . [the defendant] had . . . touched her in her private—she also called it a 'butt.' We made sure that she was making reference—what those words meant. In other words, diagrams are sometimes used—children point to themselves. She clearly stated that words that she used for her vaginal area was 'butt' or 'private.' She referred to her rectal area as 'bottom.' She referred to a male penis as a 'butt.' And she said that [the defendant] put his private in her private on several occasions, that he also would rub his private and touch her private and slimy white stuff would come out into his hand. He would throw it into the toilet.

"[The victim] said on one occasion, in particular, [that] the slimy white stuff went into her private. She got up, went into the bathroom to clean herself with toilet paper. She said, interestingly enough, that her mother almost caught them, but that when her mother came to the bathroom, she was a little nervous. So [the

---

[6] Following the trial court's decision to overrule defense counsel's objection, the assistant state's attorney indicated that the state was seeking to adduce the challenged testimony as "part of the history taking of a diagnosis by a social worker." The state does not claim on appeal, however, that Herwerth's testimony was admissible under that rationale.

victim] said, 'I just told my mother I was going to the bathroom.' She said that this would happen . . . in [the] housing projects [in which they lived]. And she said that it would happen in the bathroom, [the defendant's] bedroom and her bedroom.

"[The victim] said that [the defendant] told her not to tell because her mother would hit her if she did tell. She said that her . . . older sister had witnessed this happening. And she said that it would make her throw up. . . . She also said that he put his private in her bottom and that it hurt her, and she had told her mother that her bottom hurt her and her mother gave her medicine to help her go to the bathroom."

Sergeant John Wackerman of the Willimantic police department also testified for the state. Wackerman properly[7] testified that the victim had made a complaint to him on March 24, 1994, regarding certain acts of vaginal, oral and anal intercourse committed against her by the defendant. Wackerman also testified that the defendant had fled to Puerto Rico between three and four days after he had been confronted with the victim's allegations but before the police had had an opportunity to speak with him. Wackerman further explained that the defendant was apprehended in and extradited from Puerto Rico nearly six years later.

At the conclusion of the evidentiary portion of the trial, the court instructed the jury regarding the constancy of accusation evidence. Specifically, the trial court instructed the jury that the victim's out-of-court statements could not be considered as proof of the truth of the matters asserted therein but could only be

[7] See State v. Troupe, supra, 237 Conn. 304 ("a person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint").

considered to the extent that such testimony corroborated or did not corroborate the victim's testimony.[8]

The defendant appealed from the judgment of conviction to the Appellate Court, claiming, inter alia, that the portions of Herwerth's testimony and Kornblum's testimony that related details of the accusations made by the victim had been improperly admitted at trial. The Appellate Court agreed with the defendant that the trial court had abused its discretion in allowing the state

---

[8] The trial court instructed the jury on constancy of accusation evidence as follows: "The state offered evidence of out-of-court statements made by [the victim] to other persons that the defendant sexually assaulted her. Those persons to whom she made such statements include her school counselor, the police officer and the [department] worker. Each of these people testified as to the statements that [the victim had] made to each of them regarding the [defendant's] sexually assault[ing] her. This evidence by each of those witnesses is admitted solely to corroborate or not [to] corroborate [the victim's] testimony in court, to be consider[ed] by you only in determining the weight and credibility you will accord [the victim's] testimony in court. The evidence of out-of-court statements by [the victim] of sexual assault against her by the defendant is not to be considered by you to prove the truth of the matter asserted in those out-of-court statements. You may only consider it as corroborating what she says, but not the truth of it in itself.

"In determining whether these out-of-court statements are corroborative or not corroborative of [the victim's] testimony in court, you should consider all of the circumstances under which they were made and to whom and whether the statements made to these persons were or were not consistent with [the victim's] testimony in court.

"If you find any delay in her reporting the alleged incidents, you may consider such delay and any reasons which you may find for such delay in evaluating her testimony given here in court. You may also recall the testimony of [Leslie Martin] Lothstein [a clinical psychologist who testified for the state] regarding why sexual abuse victims may not report the alleged incidents of sexual abuse immediately. The credibility of this analysis and the weight to be given this testimony is for you, the jury, to decide. To the extent that you find that what [the victim] has said outside the courtroom is consistent with her testimony in court, you may find her testimony in court to be corroborated or supported. To the extent you find that what she has said outside the courtroom is not consistent with her testimony in court, you may consider the degree of inconsistency which you find and you may consider the reasons which you may find for the inconsistency in evaluating her testimony given here in court."

to introduce that evidence. *State* v. *Gonzalez*, supra, 75 Conn. App. 372. The Appellate Court stated: "The nature of the constancy of accusation testimony in the present case exemplifies the particular dangers that [were] . . . noted in *Troupe*. Specifically, the nature of that testimony was ideally designed to arouse the prejudices and sympathies of the [jurors]. The facts of this case present a situation [in which] a young child allegedly has been subjected to degrading abuse of the most heinous sort at the hands of an individual who is invited into the home by the victim's mother and who, ideally, should be filling the role of the victim's protector and guardian. When faced with the appalling details of the alleged assaults, the jury could not help but be roused by antipathy and disgust." Id., 372–73. With this background in mind, we turn to the merits of the state's claim.

We begin our analysis by setting forth the legal principles that govern our review. "The constancy of accusation doctrine is well established in Connecticut and recently has been reaffirmed by this court. . . . The doctrine originally was premised on the arguably inaccurate premise that, if a woman had been sexually assaulted, it would be natural for her to confide in others. . . . Until [*Troupe*], we permitted witnesses to testify about the details of a victim's accounts of the alleged sexual assault on the theory that, if the victim's story were true, the evidence would show constancy in the charge even to the details, and the truth would the more clearly appear. . . . In [*Troupe*], however, we restricted the doctrine so that a constancy of accusation witness could testify only to the fact and the timing of the victim's complaint. Even so limited, the evidence would be admissible solely for corroboration of the victim's testimony, and not for substantive purposes." (Citations omitted; internal quotation marks omitted.) *State* v. *Sullivan*, 244 Conn. 640, 645, 712 A.2d 919 (1998); see also Conn. Code Evid. § 6-11 (c).

Furthermore, this court has made clear that the admission of the details of a sexual assault victim's complaint for corroborative purposes does not carry constitutional implications. E.g., *State* v. *Troupe*, supra, 237 Conn. 305. "It is a fundamental rule of appellate review of evidentiary rulings that if [the] error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him." (Internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 39, 770 A.2d 908 (2001). Two lines of cases have developed setting forth the standard for reversing nonconstitutional, evidentiary improprieties. Under one line of cases, the defendant must establish, in order to obtain a reversal of his conviction, that it is more probable than not that the result of the trial would have been different if the error had not been committed. E.g., *State* v. *Cavell*, 235 Conn. 711, 721–22, 670 A.2d 261 (1996); *State* v. *Buster*, 224 Conn. 546, 561, 620 A.2d 110 (1993). According to a second line of cases, the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict. See, e.g., *State* v. *Askew*, 245 Conn. 351, 371–72, 716 A.2d 36 (1998). Under either formulation, "[w]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judg-

ment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 174, 777 A.2d 604 (2001).

Upon consideration of the relevant factors, we conclude that there is no reasonable likelihood that the challenged testimony of Kornblum and Herwerth had any material bearing on the jury's finding that the defendant had committed the sexual assaults against the victim as alleged by the state.[9] First, the testimony of both witnesses was very brief. The challenged portion of Kornblum's testimony consists of only one sentence, and the challenged portion of Herwerth's testimony comprises a total of approximately one page of trial transcript. Moreover, the trial court expressly apprised the jury that it was to consider the constancy of accusation testimony of Kornblum and Herwerth solely for the purpose of evaluating the victim's credibility and not as substantive evidence establishing the defendant's guilt.

Furthermore, and importantly, the victim and her half sister testified graphically and in detail about the sexual abuse that the victim had suffered at the hands of the defendant. Thus, the improper constancy of accusation testimony of Kornblum and Herwerth merely was cumulative of the testimony of the victim and her half sister, both of whom had witnessed the abuse firsthand.[10] "It

[9] In other words, we are not persuaded either that it is more probable than not that the result of the trial would have been different in the absence of the challenged testimony or that such testimony was sufficiently harmful to undermine confidence in the verdict. In light of our conclusion that the defendant cannot prevail under either formulation of the harmless error test, we need not decide whether there is any functional difference between those two standards.

[10] As the defendant notes, the victim's half sister acknowledged on cross-examination that she had falsely accused a neighbor of raping her. The defendant maintains that this admission so undermined the half sister's credibility that her testimony must be discounted entirely. We disagree. Although the jury would have been entitled to discredit the half sister's testimony in light of her acknowledgment of her prior false accusation, the jury also was free to credit her version of the events. Indeed, to the extent

is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony."[11] (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 364, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

Finally, the state's case against the defendant was very strong. In addition to the explicit and detailed testimony of the victim and her half sister, the state adduced testimony from Berrien, the physician who had examined the victim shortly after her disclosure that she had been sexually abused. Berrien stated that, on the basis of his examination of the victim, he had "a very high degree of suspicion that [the victim] had

that the jury credited the half sister's testimony, it is likely that it did so not because of the constancy of accusation evidence adduced by the assistant state's attorney in violation of *Troupe*, but because of her demeanor on the stand and the fact that her account of the defendant's conduct—which was subject to extensive cross-examination by defense counsel—was consistent in all material respects with the victim's testimony.

[11] In support of his claim that the Appellate Court correctly concluded that the admission of the challenged testimony mandated a new trial, the defendant emphasizes that Herwerth testified to certain statements of the victim containing certain facts about which the victim had not testified. Only a small portion of Herwerth's testimony, however, contained facts about which the victim herself did not testify. Most significantly, though, those additional facts were neither so graphic nor so inflammatory as to sway the jury in favor of conviction, especially in light of the explicit and detailed testimony of the victim and her half sister, both of whom witnessed the sexual abuse firsthand. The testimony to which the defendant refers consisted of Herwerth's description of an occurrence during which the victim's mother "almost caught" the defendant and the victim and that, in response, the victim had lied to her mother and told her that she "was going to the bathroom." The defendant also refers to Herwerth's testimony that the victim related to her a situation whereby the victim had told her mother that "her bottom hurt" and her mother gave her medicine. In light of the exceedingly graphic firsthand accounts of the defendant's sexual abuse of the victim, we do not see how these few additional—and essentially innocuous—facts were likely to have had *any* effect on the jury, let alone an effect so significant and prejudicial as to cast serious doubt on the fairness of the jury's verdict.

sexual contact . . . ." The evidence also established that the defendant fled to Puerto Rico between three and four days after learning about the victim's allegations against him but before the police were able to interview him about those allegations. The defendant did not return to Connecticut until his arrest and extradition almost six years later. As we previously have stated, "[f]light, when unexplained, tends to prove a consciousness of guilt . . . ." (Internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 521, 820 A.2d 1024 (2003). The defendant testified at trial but offered no explanation for his flight beyond stating that he "had to go to Puerto Rico."

In light of the graphic, detailed and firsthand nature of the properly admitted testimony of the victim and her half sister, and the strength of the state's evidence establishing that the defendant had sexually assaulted the victim, any possible harm that may have flowed from the brief portions of Kornblum's and Herwerth's testimony that exceeded the bounds of *Troupe* was minimal. We therefore disagree with the Appellate Court that the admission of the challenged testimony warrants reversal of the defendant's convictions.

The defendant claims, as the Appellate Court concluded, that the graphic details of the sexual abuse related by Kornblum and Herwerth necessarily aroused feelings of antipathy and disgust in the jurors that were so substantial as to make it impossible for the jurors to render a fair and impartial verdict. The testimony of the victim and her half sister, in which they detailed the horrific and repeated sexual abuse perpetrated against the victim by the defendant, however, also was extremely graphic and explicit in nature. Indeed, the testimony of the victim and her half sister was considerably more detailed, and certainly no less graphic, than the challenged testimony of Kornblum and Herwerth. In light of the testimony of the victim and her half sister,

we cannot see how the objectionable constancy of accusation evidence possibly could have aroused such *additional and undue* antipathy and disgust in the jurors as to require a new trial.

The defendant further asserts that the challenged testimony of Kornblum and Herwerth unfairly bolstered the credibility of the victim. We also reject this claim. Both Kornblum and Herwerth properly testified, in accordance with *Troupe*, that the victim had told them when and where the sexual abuse had occurred, and that the defendant had committed the abuse. See *State* v. *Troupe*, supra, 237 Conn. 304. In addition, Sergeant Wackerman also testified to the fact and timing of the victim's complaint. Thus, the credibility of the victim was buttressed by that portion of the constancy of accusation testimony of Kornblum, Herwerth and Wackerman that properly was admitted. Any additional corroborative value of the objectionable testimony of Kornblum and Herwerth was, at best, marginal. Moreover, as we have explained, the victim's credibility significantly was bolstered by other evidence adduced at trial, including eyewitness and medical testimony, and the evidence regarding the defendant's unexplained flight. In view of this evidence and the constancy of accusation testimony that properly was admitted, we reject the defendant's contention that Kornblum's and Herwerth's brief recitation of some of the details of the victim's complaints so significantly buttressed the victim's credibility as to taint the verdict.

Finally, the defendant claims that constancy of accusation evidence that exceeds the strictures of *Troupe* is inherently prejudicial. This claim also lacks merit. Prior to our decision in *Troupe*, details of the complaints made by sexual assault victims were routinely and properly admitted under the constancy of accusation doctrine. See, e.g., *State* v. *Rodgers*, 207 Conn. 646, 649–50, 542 A.2d 1136 (1988). In *Troupe*, of course, we

revisited that doctrine and decided that the interests of fairness are better served by limiting constancy of accusation evidence to the defendant's identity as the assailant and the time and place of the sexual assault. *State* v. *Troupe*, supra, 237 Conn. 304. In balancing the interests involved, we acknowledged that defendants accused of sexual assault have "an interest in not being unreasonably burdened by such . . . evidence . . . ." Id., 302. We also noted that "[c]oncerns about such evidence are magnified if the victim has reported the alleged offense to a number of persons, all of whom are permitted to testify about the details of the complaint." Id., 302–303. We recognized that, "[i]n such circumstances, there is an enhanced risk that the jury may be unduly swayed by the repeated iteration of the constancy of accusation testimony." Id., 303. Nevertheless, we did not conclude in *Troupe* that the reiteration of detailed complaints by numerous constancy of accusation witnesses *necessarily* would sway a jury unduly. Thus, the fact that the challenged testimony in the present case exceeded the bounds of *Troupe* does not lead inexorably to the conclusion that its improper admission constitutes reversible error. On the contrary, for the reasons that we previously noted, we conclude that the admission of the challenged testimony of Kornblum and Herwerth was harmless in the particular circumstances of this case.[12]

---

[12] We disagree with the assertion of the dissent that, "because of the professional qualifications of [Kornblum and Herwerth], the jury might reasonably have inferred that neither witness would have repeated such graphic allegations of sexual abuse unless she believed them to be true." We see no reason why any juror would have drawn an inference, one way or the other, regarding any personal belief that either Kornblum or Herwerth may have harbored concerning the victim's truthfulness. Neither Kornblum nor Herwerth was asked her personal opinion of the victim's veracity, and neither one expressed such a view. Each witness merely was asked to repeat what she had been told by the victim, and each witness did so. Indeed, the fact that Kornblum and Herwerth recited details of the victim's statements when asked to do so is no more suggestive of their personal beliefs in the victim's veracity than if they had recited only those portions of what the victim had told them that were admissible under *Troupe*. We therefore reject as

## II

The defendant also asserts three alternative grounds for affirming the judgment of the Appellate Court. Specifically, the defendant claims that: (1) he was deprived of his right to a fair trial by virtue of the trial court's failure to maintain the appearance of impartiality; (2) the trial court improperly permitted an expert witness to testify in a manner that unfairly bolstered the victim's credibility; and (3) the trial court improperly allowed the victim's mother to testify as to her belief that the defendant had sexually abused the victim.

### A

The defendant contends that his due process right to a fair trial was violated by virtue of the trial court's failure to maintain the appearance of impartiality.[13] Specifically, the defendant claims that the trial court questioned a witness in the presence of the jury in a manner that suggested that the court was acting as an advocate for the state. The defendant failed to object to the trial court's examination of the witness and, therefore, seeks to prevail on his claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[14] Although the record is

unfounded the assertion that the improper constancy of accusation testimony of Kornblum and Herwerth likely harmed the defendant because that testimony somehow conveyed to the jury that Kornblum and Herwerth personally believed that the victim's statements were true.

[13] The defendant also claims that his right to a fair trial under the state constitution was violated. Because the defendant has failed to provide an independent analysis of his state constitutional claim, we limit our review to his claim under the federal constitution. E.g., *State* v. *William C.*, 267 Conn. 686, 706–707 n.21, 841 A.2d 1144 (2004).

[14] In *Golding*, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

adequate for our review of the defendant's unpreserved claim, the defendant cannot prevail on his claim because he has failed to establish that a constitutional violation clearly exists. See id., 239–40.

The following additional facts are necessary to a resolution of this claim. At trial, defense counsel adduced testimony from Eric Galin Mart, a psychologist who specializes in the sexual abuse of children. Mart testified generally regarding the ability of children to recall events and the proper method for interviewing children who allege that they have been victims of sexual abuse. Mart specifically testified, in accordance with certain allegedly relevant professional guidelines, that such interviews should be recorded either on videotape or audiotape or through contemporaneous, verbatim transcription. Defense counsel then asked Mart to give his opinion regarding the manner in which certain interviews of the victim were conducted in the present case. Mart replied that his "biggest difficulty" was the lack of a verbatim record of those interviews. According to Mart, without such a record, it is impossible to tell whether questionable techniques, such as the use of leading questions or repetition of the same question, were utilized by the interviewers in the present case.

After both parties concluded their examinations of Mart, the trial court posed some questions to him.[15]

[15] The trial court questioned Mart as follows:

"The Court: . . . You mentioned . . . that if there is something—there was some relationship between what you perceive to be the honesty of the statements of children when there was medical corroboration of their claim, is that correct?

"[Mart]: Well, I was saying that medical corroboration is always helpful.

"The Court: All right. And you also indicated when you were discussing with [defense counsel] this whole issue of false memory that that more likely occurred when there were leading questions, is that correct?

"[Mart]: Yes.

"The Court: And if the questioners had been asking open-ended questions, there would be less likelihood of false memory?

"[Mart]: Yes. I believe that's correct.

"The Court: And your principal concern with the interviewing in this

Neither party objected to the trial court's questioning of Mart. In its instructions to the jury at the conclusion of the evidentiary portion of the trial, the court stated: "[Y]ou should not draw any inferences whatsoever from any questions that I may have asked any of the witnesses in this case."

Well established principles regarding the responsibilities of the trial judge in conducting a criminal trial guide our resolution of the defendant's claim. "Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is [the trial judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . . Consistent with his [or her] neutral role, the trial judge is free to question witnesses or otherwise intervene in a case in an effort to clarify testimony and assist the jury in understanding the evidence so long as [the trial judge] does not appear partisan in doing so. . . . Thus,

---

particular case really was the absence of a verbatim record?

"[Mart]: Yes.

"The Court: That doesn't necessarily mean that, in this particular case, the interviewers did a bad job?

"[Mart]: No. It only means that we don't know.

"The Court: And you indicated that there were, I think you said, one or two or three guidelines for assessments and that there was no official guideline?

"[Mart]: Right. Nobody really sort of owns that piece of mental health, as if the organizations that have the well regarded guidelines.

"The Court: All right. And can you tell me, have the protocols changed over the last seven years?

"[Mart]: Yes.

"The Court: Are you aware that in this particular case the interview was done in 1994?

"[Mart]: Yes.

"The Court: And since that time, has it become more common to do the interview by videotape?

"[Mart]: Yes, it has."

when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. On the contrary, the judge may, by questions to a witness, elicit relevant and important facts. . . .

"One of the chief roles of the trial judge is to see that there is no misunderstanding of a [witness'] testimony. The judge has a duty to comprehend what a witness says as much as it is [the judge's] duty to see that the witness communicates with the jury in an intelligible manner. A trial judge can do this in a fair and unbiased way. [The judge's] attempt to do so should not be a basis of error. Whe[n] the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by the clarification of a [witness'] statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of fact rather than verdicts of confusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 769–70, 760 A.2d 82 (2000).

The defendant first contends that it was unnecessary for the trial court to question Mart because Mart's testimony was not confusing. We reject this claim. Unlike an appellate court, the trial court is able to observe the testimony of witnesses firsthand and, therefore, is better able to assess the relative clarity—or lack thereof—of any particular testimony. On the basis of the printed record alone, we cannot say that Mart's testimony was so clear and straightforward that the trial court's questioning of him was wholly unnecessary or inappropriate.

The defendant further claims that the manner in which the trial court questioned Mart was improper. The defendant concedes that the majority of the trial court's questions and the answers that Mart had given in response were merely cumulative of Mart's testi-

mony. The defendant primarily takes issue with three questions posed by the trial court that, according to the defendant, demonstrated that the court was attempting to bolster the credibility or reliability of the techniques employed by the witnesses for the state who had interviewed the victim. Those questions are: (1) "[I]f the questioners had been asking open-ended questions, there would be less likelihood of false memory?" (2) "And your principal concern with the interviewing in this particular case really was the absence of a verbatim record?" And (3) "That doesn't necessarily mean that, in this particular case, the interviewers did a bad job?" Contrary to the defendant's claim, those questions contain no necessary suggestion of advocacy by the court. Moreover, as the defendant concedes, the allegedly objectionable questions and answers thereto consisted essentially of restatements of Mart's testimony, elicited on direct examination, regarding his opinion of the integrity of the interviews of the victim. Thus, the questions served merely to clarify Mart's testimony for the jury. See, e.g., *State* v. *Mack*, 197 Conn. 629, 641, 500 A.2d 1303 (1985) ("[a court's] comments or questions for the purpose of clarifying . . . testimony are permissible and often necessary"). Furthermore, "[t]he court's questioning of a witness is not necessarily improper [merely] because it draws attention to the strengths or weaknesses of a party's case." *State* v. *Smith*, 200 Conn. 544, 550, 512 A.2d 884 (1986). Thus, the fact that the trial court's questions addressed Mart's criticism of the interview process as it relates solely to the lack of a verbatim record does not render that questioning improper. Finally, the trial court admonished the jury in forceful and straightforward language that it was not to draw any inferences on the basis of any questions that the court may have asked any of the witnesses. We therefore conclude that the defendant's right to a fair trial was not violated by virtue of the trial court's questioning of Mart.

## B

The defendant claims that the trial court improperly permitted Leslie Martin Lothstein, a clinical psychologist who testified for the state regarding the psychological characteristics and behavioral patterns of child victims of sexual abuse, to testify in a manner that unfairly bolstered the credibility of the victim. We conclude that the defendant is not entitled to review of his claim of evidentiary impropriety.[16]

The following additional facts and procedural history are relevant to this claim. Before Lothstein took the stand, defense counsel objected to any testimony by Lothstein regarding "sexual assault syndrome." Defense counsel noted that the characteristics of sexual assault syndrome are consistent with the fact that sexual abuse has occurred. Defense counsel thus claimed that any opinion testimony regarding whether the victim had suffered from sexual assault syndrome would embrace an ultimate issue to be decided by the jury,[17] namely, whether the defendant had sexually assaulted the victim. The trial court stated that it would "allow the testimony," concluding that "courts generally allow the admissibility of expert testimony regarding certain types of conduct or syndromes that are beyond the competence of the average person to fully understand."

Lothstein then proceeded to testify generally regarding the behavioral characteristics of child victims of sexual assault.[18] Subsequently, the assistant state's attorney asked Lothstein whether an individual with a psychological assessment similar to that of the victim likely would delay reporting sexual abuse. Lothstein

---

[16] The defendant does not contend that the alleged evidentiary impropriety rose to the level of a constitutional violation and, therefore, does not seek to prevail on his claim under *State* v. *Golding*, supra, 213 Conn. 239–40.

[17] See Conn. Code Evid. § 7-3.

[18] The defendant does not challenge the propriety of that testimony on appeal.

answered by reference to specific allegations made by the victim about her family life. Defense counsel did not object either to the form of the questions or to Lothstein's answers.

For the first time on appeal, the defendant claims that Lothstein improperly expressed an expert opinion that was based upon the specific characteristics of the victim and that Lothstein improperly assumed the truth of the victim's allegations regarding her family life. According to the defendant, this claim properly was preserved by virtue of defense counsel's objection at trial. The state contends that the claim that the defendant raises on appeal is different from the claim that defense counsel made at trial in objecting to Lothstein's testimony and, therefore, that the defendant's claim was not properly preserved. We agree with the state that defense counsel's objection at trial did not preserve the defendant's claim on appeal.

"The standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *Daley* v. *McClintock*, 267 Conn. 399, 404–405, 838 A.2d 972 (2004); see Practice Book § 5-5.[19]

[19] Practice Book § 5-5 provides in relevant part: "Whenever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he or she desires it to go upon the record, before any discussion or argument is had. . . ."

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Citation omitted.) *State* v. *Bush,* 249 Conn. 423, 428, 735 A.2d 778 (1999).

At trial, defense counsel objected to Lothstein's proffered testimony regarding sexual assault syndrome in general on the ground that such testimony would embrace an ultimate issue to be decided by the jury. On appeal, however, the defendant does not challenge the validity of such testimony generally; rather, he claims that Lothstein improperly based some of his opinion testimony on the specific characteristics of the victim and, in addition, that he improperly assumed the truth of the victim's allegations about her family life. Defense counsel did not object to Lothstein's testimony on these grounds. Although a defendant is entitled to review of unpreserved errors of *constitutional* magnitude under *Golding,* the defendant makes no claim that the admission of the testimony that he challenges *on appeal* rises to the level of a constitutional violation. Accordingly, the defendant is not entitled to review of his claim.

C

Finally, the defendant claims that the trial court abused its discretion in permitting the victim's mother, M, to testify, during cross-examination by the state, that she believed that the defendant had sexually abused the victim. The state maintains that defense counsel "opened the door to this line of inquiry" by eliciting testimony from other witnesses regarding M's disbelief of the victim's allegations. The state further contends that the defendant has not demonstrated that the admis-

sion of M's testimony, even if improper, was harmful. We agree both with the state's primary contention that the trial court did not abuse its discretion in permitting the challenged testimony and with the state's alternative contention that, even if the admission of the testimony were improper, the defendant has failed to demonstrate that the testimony was harmful.

The following additional facts inform our resolution of the defendant's claim. Defense counsel introduced evidence suggesting that M did not believe the victim's allegations of sexual abuse. Defense counsel introduced this evidence through his cross-examination of Kornblum[20] and through his direct examination of Gloria Rodriguez,[21] the defendant's wife at the time of trial. Defense counsel later called M as a witness but did not ask her if she believed the victim's allegations. On cross-examination, the assistant state's attorney asked M if she believed, at the time of her testimony, that the defendant had sexually abused the victim. Defense counsel objected, and the assistant state's attorney responded that defense counsel had "opened the door" to the question. The trial court allowed M to answer the question, and M responded affirmatively.

Other evidence adduced at trial indicated that M had physically abused the victim and the victim's half sisters while they were in M's care. Specifically, the victim testified that M had hit her with her hands, a broom and a belt, and that the beatings had occurred "[a]lmost

---

[20] Defense counsel asked Kornblum: "And in response to that confrontation . . . [during which the allegations of sexual abuse were made known to the defendant and M, M] continued to insist that the girls were lying, is that correct?" Kornblum replied that M "seemed to have difficulty believing the girls," namely, the victim and her half sister.

[21] Defense counsel asked Rodriguez if M had threatened her. Rodriguez replied in the affirmative. Defense counsel then asked Rodriguez to explain the nature of the threat, and Rodriguez replied that "the threat was that [the defendant] was going to pay for something that he didn't do because he was innocent."

every day." The victim's half sister also testified that M had hit her and the victim. Furthermore, at the time of her testimony, M was facing criminal prosecution for risk of injury to a child and witness tampering. Both charges related to the alleged sexual abuse of the victim's half sister.

Before addressing the merits of the defendant's claim, we first set forth the applicable standard of review. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . .

"[D]eterminations of credibility are for the jury, and not for witnesses. . . . Therefore, it is improper to ask a witness to comment on another witness' veracity. . . . [Q]uestions that ask a defendant to comment on another witness' veracity invade the province of the jury. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 454, 832 A.2d 626 (2003).

The state concedes that, if defense counsel had not adduced testimony indicating that M disbelieved the victim's allegations, it would have been improper for the assistant state's attorney to ask M whether she

believed that the defendant had sexually abused the victim. The state claims, however, that because defense counsel injected the issue into the case, the trial court did not abuse its discretion in permitting the challenged testimony. We agree with the state.

Generally, "[t]he party who initiates discussion on [an] issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the [trial] court may, in its discretion, allow it whe[n] the party initiating inquiry has made unfair use of the evidence." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 186–87, 864 A.2d 666 (2004). Because defense counsel had adduced evidence regarding M's disbelief of the victim's allegations of sexual abuse, the trial court reasonably permitted the state to rebut that evidence through the testimony of M.[22]

The defendant contends that he did not open the door to M's testimony because he introduced evidence of M's disbelief of the victim's allegations of sexual abuse through the testimony of Kornblum and Rodriguez and not through any testimony of M herself.[23] Con-

[22] The defendant maintains that, even if defense counsel did open the door to M's testimony, the trial court should have barred the challenged testimony because it was more prejudicial than probative. According to the defendant, M's testimony "undoubtedly" affected the verdict because M was the victim's mother and, at the time of the sexual assaults, M resided with the victim and the defendant. Even if we assume, arguendo, that M's testimony was particularly probative, in such circumstances, it would have been unfair to bar the state from seeking to rebut the testimony elicited by defense counsel indicating that M did not believe the victim's allegations. Thus, to the extent that M's testimony was damaging to the defendant because it was especially probative, that testimony also was especially important in light of the evidence presented by defense counsel regarding M's disbelief of the victim's allegations.

[23] The defendant also claims that, because defense counsel only elicited testimony regarding whether M believed the victim's allegations *when they were made*, he did not open the door to testimony about whether M believed the victim's allegations *at the time of trial*. This claim lacks merit. A party who elicits testimony from a witness on a particular issue cannot block an opposing party from placing that testimony in context. See *State* v. *Paulino*,

trary to the defendant's claim, there is no reason to limit the right of a party to place in context testimony adduced by an opposing party and, consequently, appellate courts have not done so. See, e.g., *State* v. *Ankerman*, 81 Conn. App. 503, 515–16, 840 A.2d 1182 (defendant opened door to certain witness' testimony elicited by state when defendant had cross-examined victim on same matter), cert. denied, 270 Conn. 901, 853 A.2d 520, cert. denied, 543 U.S. 944, 125 S. Ct. 372, 160 L. Ed. 2d 256 (2004); *State* v. *Moran*, 53 Conn. App. 406, 413–14, 731 A.2d 758 (by introducing evidence through his own direct testimony, defendant opened door to examination of witness on same subject), cert. denied, 249 Conn. 925, 733 A.2d 849 (1999). Accordingly, we conclude that the trial court did not abuse its discretion in permitting the state to rebut the evidence adduced by defense counsel regarding M's disbelief of the victim's allegations.

Even if the admission of the challenged testimony was improper, the defendant has not demonstrated that the impropriety was harmful. The jurors had ample opportunity to assess for themselves the credibility of all the witnesses, including the victim and M, and the court repeatedly instructed the jurors that they alone were to determine the credibility of the witnesses. Moreover, it is highly improbable that the jury placed much weight on the challenged testimony of M because the evidence established that M had expressed differing opinions, over time, about whether the defendant had

223 Conn. 461, 467, 613 A.2d 720 (1992) ("[t]his rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context" [internal quotation marks omitted]). Thus, the rule allowing a party to offer rebuttal evidence when the opposing party has "opened the door" to the introduction of such evidence prohibits the defendant from excluding evidence regarding M's belief of the victim's allegations at one time while introducing evidence of M's disbelief of the victim's allegations at another time.

sexually abused the victim. In addition, both the victim and her half sister testified that M frequently had abused them physically. Finally, the jury was aware that M was facing criminal charges, at the time of the trial, relating to the care of one of her children. Because M's credibility was questionable, her testimony regarding her belief that the defendant had sexually abused the victim was unlikely to have had any material effect on the jury's verdict.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion SULLIVAN, C. J., and BORDEN, NOR-COTT, KATZ and ZARELLA, Js., concurred.

VERTEFEUILLE, J., dissenting. I respectfully disagree with the majority's determination that the Appellate Court improperly concluded that the state's use of constancy of accusation testimony, although beyond the scope of *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996), constituted harmful impropriety warranting reversal of the defendant's conviction. After a careful review of the evidence, I am persuaded that, in the present case, the iteration of the graphic details of the sexual assaults on the victim, as well as the additional details not testified to by the victim or her half sister, who had witnessed some of the sexual assaults, may have had a tendency to influence the jury by improperly bolstering the credibility of the victim and her half sister and by unfairly arousing in the jury feelings of antipathy toward the defendant. Accordingly, I would affirm the Appellate Court's judgment that reversed the trial court's judgment of conviction and ordered a new trial. I therefore dissent.[1]

---

[1] Because I would affirm the Appellate Court's judgment that reversed the trial court's judgment of conviction, I do not address the defendant's alternate grounds for affirmance.

Whether the improper admission of evidence is harmless in a particular case "depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *William C.*, 267 Conn. 686, 708–709, 841 A.2d 1144 (2004).

Prior to addressing the substance of the testimony in question, I believe that it is important to take note of the credentials of the two witnesses whose testimony was improperly admitted. The testimony at issue came from two highly qualified individuals who had substantial professional skill and experience in dealing with cases of alleged child molestation, thereby giving their testimony greater weight in the eyes of the jury. Rita Kornblum, an intake worker for the department of children and families (department) at the time of the investigation of the alleged incidents in this case, had worked for the department for over three and one-half years and for the New Jersey equivalent of the department for more than eight years. She testified that she had experience in social work, investigatory practices, and counseling services, and had received special training in handling cases of child molestation. Similarly, Kimberly Herwerth, a sexual assault crisis counselor, was a state certified child crisis counselor for more than ten years, and had worked at both the Northeastern Connecticut Sexual Assault Crisis Services and Saint Francis Hospital Children's Center in that capacity. She testified that,

at the time she interviewed the victim, her counseling focused on "children who were in crisis, who had made allegations of sexual abuse," and she had worked with more than 900 alleged victims of molestation. It is important to evaluate the significance of the testimony of these witnesses in light of their experience and expertise. I find it reasonable to presume that because of the professional qualifications of these witnesses, the jury might reasonably have inferred that neither witness would have repeated such graphic allegations of sexual abuse unless she believed them to be true.

I turn next to the substance of the testimony in question. Following the testimony of the victim and her half sister, both Kornblum and Herwerth reiterated horribly graphic details of the sexual assaults as related to them by the victim. In my view, the harmfulness of the testimony of Kornblum and Herwerth[2] derives from their repetition of the most lurid details of the sexual abuse of the victim: the defendant's multiple penetrations of the victim's vagina and anus with his penis and the defendant's multiple ejaculations resulting from his abuse of the seven year old victim. The witnesses testified that the victim had told them that the defendant, "on several occasions," had "inserted his penis . . . into her private parts" or had "put his private in her private . . . ." Moreover, Kornblum testified that the victim "described some white stuff coming out of [the defendant's] . . . 'penis.' " Herwerth testified that the victim had told her that "slimy white stuff would come out into his hand. He would throw it into the toilet."

Herwerth's testimony highlighted the victim's emotional state due to the fact that the abuse had been witnessed by her half sister. Herwerth testified that the victim had told her that "her [half sister] had witnessed

---

[2] See part I of the majority opinion for the relevant excerpts of the testimony of both Kornblum and Herwerth.

[the sexual assaults] . . . and it would make her throw up." Herwerth's testimony also repeated the fact of the defendant's threat to the victim. She testified that the defendant had warned the victim "not to tell because her mother would hit her if she did tell."

In addition, Herwerth related an incident of abuse not mentioned by either the victim or her half sister in their testimony. This additional incident revealed the victim's anxiety that her mother might discover the abuse. Herwerth testified that the victim had mentioned an incident in which the victim's mother "almost caught" the defendant sexually assaulting the victim when "on one occasion in particular the slimy white stuff went into her [vagina]. [The victim] got up, went to the bathroom to clean herself with toilet paper. [The victim] said . . . that her mother almost caught them, but that when her mother came to the bathroom [the victim] was a little nervous . . . [so she told her mother she] was going to the bathroom."

In my view, the testimony of Kornblum and Herwerth unfairly influenced the jury in exactly the manner we intended to avoid as we explained in *Troupe*. In *Troupe*, we reasoned that "testimony by multiple witnesses about the facts of the victim's complaint may so *unfairly bolster the victim's credibility* that, in such cases, cross-examination of the victim is not a sufficient protection from prejudice." (Emphasis added; internal quotation marks omitted.) *State* v. *Troupe*, supra, 237 Conn. 303. We stated therefore that in such circumstances there is an "enhanced risk that the jury may be *unduly swayed* by the repeated iteration of the constancy of accusation testimony." (Emphasis added.) Id. Thus, we concluded that "a person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint . . . ." Id., 304.

I cannot conclude that in the present case this graphic testimony from two trained professionals repeating the details of multiple sexual assaults on a seven year old girl did not "unfairly bolster the victim's credibility" and therefore "unduly [sway]" the jury. Id., 303.

Moreover, my conclusion that the improperly admitted testimony of Kornblum and Herwerth may have unfairly influenced the jury is reinforced by the fact that: (1) the defendant raised serious questions about the credibility of both the victim and her half sister; and (2) without the testimony of Kornblum and Herwerth, the state's case was not particularly strong. The defendant undermined the credibility of both the victim and her half sister by: (1) eliciting testimony from the victim revealing a possible motive to lie; and (2) revealing prior lies told by the victim's half sister. During cross-examination of the victim, she admitted that her mother had physically abused her and her half sister. In particular, the victim testified that her mother would hit her and her half sister with her hand, a broom or a belt on her head, thighs, face, arms, back and legs, almost daily. Thus, defense counsel elicited evidence regarding a possible motive for the victim to fabricate the allegations of sexual abuse, namely, a desire to be removed from the home. Furthermore, during cross-examination, the victim's half sister, the state's only eyewitness to the abuse, admitted to falsifying an allegation of sexual assault against her mother's boyfriend in 1998. The victim's half sister admitted that she had fabricated the sexual assault allegation only because her mother's boyfriend had been "getting into [her] business" and "snitching" on her to her mother. The jury might well have given additional weight to the testimony of Kornblum and Herwerth in light of these questions about the credibility of the victim and her half sister.

Additionally, I believe that without the testimony of Kornblum and Herwerth, the state's case was not particularly strong, and the defendant's conviction therefore may have resulted from the jury's increased reliance on their testimony. First, there was no physical evidence of the defendant's guilt, such as DNA, semen or blood analysis pointing to the defendant as the perpetrator of the alleged sexual assaults. Additionally, the medical evidence admitted on the issue of whether the victim had been sexually assaulted was ambiguous at best. On cross-examination, although Frederick B. Berrien, the physician who examined the victim, maintained that the inflammation he found in the victim's vagina was due to an infection that he believed was indicative of sexual contact, he also acknowledged that "any sort of trauma could [have caused the inflammation]." Berrien also testified that, at the time of the victim's examination, she did not exhibit any lacerations to the labia or her hymen, nor did she have any labial adhesions. He also acknowledged that he could not state, with any reasonable medical certainty, what type of object had penetrated the victim.[3] Finally, Berrien testified that, due to research that had been performed in the years subsequent to his examination of the victim, his findings regarding the victim "would not necessarily indicate that the full penetration . . . necessarily is confirmed by . . . the findings that were present . . . during the examination."[4]

---

[3] Berrien also could not identify with any reasonable degree of medical certainty the person who had penetrated the victim. It should be noted that the victim also alleged that two other males had sexual contact with her during the same time period that she claimed the defendant had committed these sexual assaults.

[4] Specifically, Berrien testified: "At the time that this examination was done, [more than] seven years ago, there was greater weight placed upon the hymenal opening and the amount of hymen that was present. And it's possible [that he would have confirmed sexual abuse], because my records do reflect that there was a sense that penetration had occurred at that time . . . . [I]n the interim time, over the past seven years . . . our profession has looked at some of the findings and has determined that this would not

Thus, I am persuaded that in the present case, the testimony of Kornblum and Herwerth, two experienced professionals, concerning the graphic details of the assaults on the victim, as well as the additional details not testified to by the victim or her half sister, may have had a tendency to influence the judgment of the jury by improperly bolstering the credibility of the victim and her half sister and by unfairly arousing feelings of antipathy in the jury. I therefore agree with the Appellate Court's conclusion that the defendant was entitled to a new trial and I disagree with the majority's determination to reverse the judgment of the Appellate Court.

Accordingly, I respectfully dissent.

necessarily indicate that the full penetration, as you referred to, necessarily is confirmed by this—by the findings that were present . . . during the examination."